In the

# United States Court of Appeals

## For the Seventh Circuit

No. 13-3601

KENNETH OWEN SCROGHAM,

*Plaintiff-Appellant,*

*v.*

CAROLYN W. COLVIN,
Acting Commissioner of Social
Security,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Southern District of Indiana, New Albany Division.
No. 4:12-cv-00111-TWP-WGH — **Tanya Walton Pratt**, *Judge.*

ARGUED MAY 28, 2014 — DECIDED AUGUST 27, 2014

Before RIPPLE, WILLIAMS, and HAMILTON, *Circuit Judges.*

RIPPLE, *Circuit Judge.* Kenneth Owen Scrogham applied for disability benefits under the Social Security Act, submitting that a variety of medical conditions—including degenerative discs, spinal stenosis, sleep apnea, hypertension, arthritis, atrial fibrillation and restless leg syndrome—constituted a qualifying

disability. After his application was denied, Mr. Scrogham participated in a hearing before an administrative law judge ("ALJ") for the Social Security Administration ("Administration"). The ALJ denied Mr. Scrogham's application for benefits, and the Administration's Appeals Council denied his request for review. Accordingly, Mr. Scrogham filed a complaint in the United States District Court for the Southern District of Indiana, seeking judicial review of the ALJ's decision. The district court affirmed the denial of benefits, holding that the ALJ did not err in giving less weight to the opinion of a treating physician than to the opinions of nontreating physicians, that the ALJ permissibly found Mr. Scrogham not to be credible and that the ALJ's decision otherwise was supported by substantial evidence. Mr. Scrogham timely appealed.

We now reverse the judgment of the district court and remand for further proceedings. In our view, the ALJ's methodology was flawed in several respects. The ALJ impermissibly ignored a line of evidence demonstrating the progressive nature of Mr. Scrogham's degenerative disc disease and arthritis. As a result, the ALJ inappropriately undervalued the opinions of Mr. Scrogham's treating physicians, whose longitudinal view of Mr. Scrogham's ailments should have factored prominently into the ALJ's assessment of his disability status. Second, even if we confined our review of the record to the snapshots of evidence that the ALJ considered, we do not think that this limited evidence builds the required logical bridge to her conclusions. Specifically, the ALJ seems to have misapprehended or at least to have considered only partially some of the evidence about Mr. Scrogham's daily activities, rehabilitation efforts and physicians' evaluations.

This lapse affected both the ALJ's credibility determination and her residual functional capacity assessment. Because the ALJ's opinion reflects a flawed evaluation of the record evidence, we reverse the judgment of the district court and remand the case for further proceedings consistent with this opinion.

# I

## BACKGROUND

### A.

When the Administration denied Mr. Scrogham's request for benefits, he was fifty-three years old and married with adult children. He had a high school education and, until November 2007, had been employed consistently since 1993. He had worked as a sales manager at an automotive sales company, as a landscaper and a landscape designer, as a sales representative for a building supply store and as the marketing director of a company. Most recently, he had worked from January 2007 to November 2007 in a restaurant, where he made pizzas and did some supervisory and managerial tasks, such as scheduling. Mr. Scrogham claims that he had to stop working because he had a variety of health problems, primarily back and leg pain, that made working "just entirely too rough on [him]."[1]

The Administrative Record contains evidence of extensive treatment by both primary care physicians and specialists, as well as evidence from physicians associated with the state

---

[1] A.R. at 49.

disability agency. Mr. Scrogham has been receiving medical attention for a number of conditions, including back and leg pain, since at least 2004. An x-ray of Mr. Scrogham's lumbar spine in 2004 revealed, among other problems, "mild to moderate spondylosis … from L1 through L5" and "degenerative joint disease of the T10 costotransverse joints."[2] Apart from this report, the record is relatively sparse until 2008. Reports by Clifty Falls Chiropractic from 2008 reflect the pain that Mr. Scrogham was experiencing due to his back issues, and treatment notes indicate that Mr. Scrogham's pain was increasing in frequency as time went on. Mr. Scrogham also was treated for a heart condition in 2008. In March, he was hospitalized with atrial fibrillation. Dr. James Jackson performed a cardiac catheterization. Mr. Scrogham's primary physician at that time, Dr. Steven Adams, wrote a note when Mr. Scrogham was discharged from the hospital indicating that Mr. Scrogham had "severe degenerative arthritis" and morbid obesity.[3]

On April 8, 2008, Dr. Adams listed Mr. Scrogham's ailments as obstructive sleep apnea, atrial fibrillation, severe degenerative arthritis in his knees and hypertension. Dr. Adams indicated that all of these conditions were related to Mr. Scrogham's weight and expressed his opinion that lap-band surgery was "medically necessary" for Mr. Scrogham.[4] Mr. Scrogham then was transferred to the care of Dr. Mark Totten, whose diagnoses corresponded with those of

---

[2] *Id.* at 305.

[3] *Id.* at 340–41.

[4] *Id.* at 329.

Dr. Adams. On July 18, 2008, Dr. Totten stated that Mr. Scrogham had hypertension, severe sleep apnea, morbid obesity, back problems and numbness in his legs. Dr. Totten included notes about Mr. Scrogham's activity level; specifically, he indicated that Mr. Scrogham "has been helping work on his sister[']s roof recently although normally he isn't quite that active. He has been trying to do work on a bicycle that seems to be tolerated by his joints and back. He has been trying to watch his diet."[5]

Dr. Totten referred Mr. Scrogham to Dr. Alcorn for evaluation of his sleep apnea. In May 2008, Mr. Scrogham underwent a sleep study, after which he was instructed to use a CPAP device[6] to treat his sleep apnea. When Dr. Alcorn saw Mr. Scrogham on July 21, 2008, for a consultation regarding sleep apnea, recurrent leg movement affecting his sleep apnea treatment and lap-band surgery, Dr. Alcorn observed that Mr. Scrogham was morbidly obese, and that he was "unable to have a decent day."[7] On March 19, 2009, Dr. Alcorn reported that Mr. Scrogham was experiencing numbness in his legs and feet and that he was "unable to walk more than about a block

---

[5] *Id.* at 325.

[6] A continuous positive airway pressure ("CPAP") device delivers air pressure to a mask, which prevents sleep apnea by keeping the upper airway passages open. *Continuous Positive Airway Pressure*, Mayo Clinic, http://www.mayoclinic.org/diseases-conditions/sleep-apnea/multimedia/continuous-positive-airway-pressure-cpap/img-20007977 (last visited August 6, 2014).

[7] A.R. at 470.

before he cramps up."[8] Dr. Alcorn stated that Mr. Scrogham was unable to work. About a week after that appointment, on March 25, 2009, Mr. Scrogham underwent an MRI, which revealed "moderate to severe bilateral neural foraminal narrowing and moderate spinal stenosis" at his L2–L3 vertebrae and "moderate bilateral neural foraminal narrowing and moderate to severe spinal stenosis" at his L3–L4 vertebrae, all due to degenerative spondylosis.[9]

On April 9, 2009, Dr. Alcorn saw Mr. Scrogham and wrote that he was having "a terrible time with his morbid obesity. He is being evaluated for morbid obesity bariatric surgery."[10] He observed that the medical findings were "consistent with what appears to be a spinal stenosis case, symptomatic in which he can barely walk."[11] This opinion was echoed by Dr. John Guarnaschelli, who met with Mr. Scrogham on April 23, 2009, to evaluate him as a potential candidate for surgery to treat his spinal stenosis. Dr. Guarnaschelli wrote that Mr. Scrogham "has been unable to stand or walk with any degree of confidence since November 2007, and has been unable to be employed since that period of time."[12] He recommended a nonsurgical approach to Mr. Scrogham's condition

---

[8]  *Id.* at 457.

[9]  *Id.* at 279.

[10]  *Id.* at 455.

[11]  *Id.*

[12]  *Id.* at 449.

because of the high risk posed by his other medical problems. On June 15, 2009, Mr. Scrogham told Dr. Alcorn that his back was causing problems with his legs and feet. Dr. Alcorn observed that Mr. Scrogham had lost twenty-two pounds in a short period of time, which was "excellent," but that he had "increased back pain which occurred after planting a garden."[13]

On June 29, 2009, Mr. Scrogham was examined by Dr. Richard Gardner, who was affiliated with Indiana's Disability Determination Bureau. Dr. Gardner recounted some of Mr. Scrogham's past employment and stated that he was "let go for performance" in November 2007 from his position as a pizzeria manager.[14] According to Dr. Gardner, Mr. Scrogham had morbid obesity; degenerative disc disease; hypertension and hyperlipidemia, which were medically managed; and a history of atrial fibrillation. Mr. Scrogham told Dr. Gardner that he could only walk about twenty feet at a time due to his lower back pain. However, Mr. Scrogham was ineligible for surgery because of his obesity. Dr. Gardner wrote that Mr. Scrogham had a "[f]ull range of motion of cervical spine and nearly full range of motion of lumbar spine,"[15] and

---

[13] *Id.* at 545.

[14] *Id.* at 516.

[15] *Id.* at 517. Although his summary of the findings stated that Mr. Scrogham had a "nearly full range of motion of lumbar spine," the section of his notes describing range of motion states that Mr. Scrogham's range of motion for forward flexion was 40, for extension was 10 and for

(continued...)

that he had a "[f]ull range of motion of both shoulders and both knees."[16] He stated that Mr. Scrogham could get on and off the exam table without assistance; had good grip strength; and could perform activities such as buttoning, zipping and picking up a coin. Mr. Scrogham could walk without the need for assistive devices and could tandem walk without problems. Mr. Scrogham's balance, motor strength and deep tendon reflexes appeared normal. Mr. Scrogham could stand on his toes and do a half squat.

A month later, Dr. J. Sands, a consulting physician with the state agency, completed a residual functional capacity assessment based on the medical evidence in the record. Dr. Sands listed degenerative disc disease as Mr. Scrogham's primary diagnosis and morbid obesity as his secondary diagnosis. Dr. Sands opined that Mr. Scrogham could lift or carry twenty pounds, frequently lift or carry ten pounds, stand or walk for about six hours in an eight-hour work day and sit for about six hours in an eight-hour work day. Dr. Sands also stated that Mr. Scrogham could occasionally climb a ramp or stairs (but not a ladder or scaffold) and that he could occasionally balance, stoop, kneel, crouch and crawl. When asked to discuss whether the severity of the symptoms alleged by Mr. Scrogham was consistent with the medical and nonmedical evidence in the record, Dr. Sands wrote that it was "credible

---

[15] (...continued)
lateral flexion was 10. His notes also state that the normal ranges of motion for those measurements were 90, 25 and 25, respectively.

[16] *Id.*

for limitations due to obesity."[17] In September 2009, Dr. J.V. Corcoran, another consulting physician with the state agency, reviewed Mr. Scrogham's case file and approved Dr. Sands's opinion.

The next several months of treatment reflect major ups and downs in Mr. Scrogham's condition. For example, by his visit with Dr. Alcorn on July 27, 2009, Mr. Scrogham had lost forty pounds, and Dr. Alcorn noted that Mr. Scrogham was "doing tremendous" and that his "back/spinal stenosis has improved some."[18] On November 13, 2009, however, Mr. Scrogham told Dr. Alcorn that he did not "feel good at all."[19] Dr. Alcorn noted that Mr. Scrogham's weight loss was up to seventy pounds and that Mr. Scrogham "ha[d] done everything [Dr. Alcorn] ha[d] asked him to do."[20] He also wrote, "This gentleman is disabled and wants to return to active work and this is our best chance."[21]

It appears that, around this time, Mr. Scrogham's condition became severe enough and his weight loss was substantial enough to consider surgery. Dr. Alcorn referred Mr. Scrogham to a surgeon, Dr. Steven James, in order to consult with him about the possibility of undergoing back surgery. Dr. James

---

[17] *Id.* at 524.

[18] *Id.* at 543.

[19] *Id.* at 651 (internal quotation marks omitted).

[20] *Id.*

[21] *Id.*

examined Mr. Scrogham and observed that he could walk on his heels, but not on his toes; that Mr. Scrogham seemed to have good strength, with mild exceptions; that he had problems with his lower extremities; and that the straight-leg raise and hip-rotation tests were negative on both sides. Dr. James noted that Mr. Scrogham was unable to walk more than fifty yards without sitting down because of his spinal stenosis and that he "really has not had gainful employment for the last few years because of his symptoms."[22] Dr. James sent Mr. Scrogham to a pain management specialist, Dr. Jose Vitto, who administered epidural steroid injections to treat Mr. Scrogham's back pain on November 18 and December 18, 2009, and on January 6, 2010.

Mr. Scrogham's increased pain continued into early 2010. On January 29, 2010, Dr. James noted that Mr. Scrogham "still has the pain when he is up and his legs seem to want to give out. He cannot walk any distance. He cannot stand for any period of time."[23] On February 4, 2010, an MRI revealed negative changes in Mr. Scrogham's back condition, most noticeably at the L3–L4 vertebrae, where there was "a large bulge and facet hypertrophy which is causing near complete obliteration of the central canal and lateral recesses and moderate narrowing of the neuroforamen," and secondarily at the L2–L3 vertebrae.[24] By March 2010, Mr. Scrogham was set to have surgery. At a consultation on March 19, 2010, Dr. James

---

[22] *Id.* at 615.

[23] *Id.* at 607.

[24] *Id.* at 622.

noted that Mr. Scrogham "still has quite a bit of problems standing upright or walking any distance secondary to neurogenic claudication along with back pain."[25] He observed that Mr. Scrogham was "quite debilitated by his inability to get up and walk any distance or stand for any period of time."[26] At this visit, Dr. James noted Mr. Scrogham's continued weight loss.

Dr. James operated on Mr. Scrogham's back on April 21, 2010.[27] According to Dr. James, Mr. Scrogham "tolerated the procedure without difficulties."[28] Throughout the next year, both Dr. James and Dr. Alcorn had extensive follow-up visits with Mr. Scrogham. For a period of time, Mr. Scrogham's recovery appears to have proceeded smoothly. For example, on May 21, 2010, Dr. James noted that Mr. Scrogham seemed to be doing well, and, in particular, that Mr. Scrogham was continuing to lose weight and was walking at least three-quarters of a mile every day as part of his rehabilitative regimen. By July, Mr. Scrogham was walking 1.1 miles twice a day, although it took Mr. Scrogham twenty-eight minutes to walk that far. Dr. James also noted, however, that throughout

---

[25] *Id.* at 606.

[26] *Id.*

[27] The post-operative notes indicate that Mr. Scrogham had a "[d]ecompressive laminotomy, L2–3, L3–4, with meso facetectomy, interspinous fusion with the Aspen system, along with facet fusion." *Id.* at 601.

[28] *Id.*

this period of rehabilitation, as Mr. Scrogham increased his activity level, his knees began to hurt more.

On August 19, 2010, Dr. Alcorn examined Mr. Scrogham; his notes indicate that Mr. Scrogham, despite the surgery, was still experiencing debilitating problems. Specifically, he wrote, "This patient has had serious back problems. We have been over everything. He appears to me otherwise to have no new changes."[29] He elaborated: "He is still not back to work. I have filled out his papers and there is very little else any of us can do for him other than rehabilitation."[30] That same day, Dr. Alcorn completed a residual functional capacity assessment for Mr. Scrogham. Dr. Alcorn reported that Mr. Scrogham could sit for one hour at a time, but could not stand or walk for even one hour during an eight-hour work day. He stated that Mr. Scrogham could not lift or carry even up to five pounds of weight. He believed that Mr. Scrogham could use his hands for simple grasping and fine manipulation, but not for pushing or pulling arm controls. Further, Mr. Scrogham could not push or pull leg controls. He reported that Mr. Scrogham could not bend, squat, crawl, climb or reach at all. Finally, he stated that Mr. Scrogham was completely restricted from activities involving unprotected heights, moving machinery, driving and changes in temperature or humidity.

Throughout the fall of 2010, Mr. Scrogham continued with his weight loss and walking regimen, but by early 2011, it appears that his rehabilitation efforts were slowing down. For

---

[29] *Id.* at 640.

[30] *Id.*

example, on February 10, 2011, Mr. Scrogham saw Dr. Alcorn, who noted a "complex situation," in which Mr. Scrogham had experienced "marked improvement in his mobility," but only because he took Lortab, a powerful painkiller and sedative,[31] three times a day.[32] At that visit, Dr. Alcorn also observed numbness and Raynaud's phenomenon in Mr. Scrogham's feet. On May 3, 2011, Mr. Scrogham told Dr. Alcorn that his back pain had increased recently and that he had fallen twice in two weeks. And on May 10, 2011, Dr. James noted that Mr. Scrogham had experienced increased problems with back pain over the winter and that he had more numbness and instability than before. He also noted that Mr. Scrogham had been very depressed and that he had gained weight since his last visit and needed to focus on weight loss. Dr. James said that Mr. Scrogham could still walk a mile without major difficulties, and that he was going to attempt to do a better job with weight loss over the summer.

## B.

While undergoing the above-described treatment, Mr. Scrogham filed an application, in April 2009, for Supplemental Security Income and Disability Insurance Benefits under the Social Security Act. He stated that he became disabled as of November 11, 2007, due to the following medical conditions: degenerative discs, spinal stenosis, sleep apnea,

---

[31] Dorland's Illustrated Medical Dictionary 878, 1075 (32d ed. 2012).

[32] *Id.* at 635.

hypertension, arthritis in his knees, atrial fibrillation and restless leg syndrome. His claim was denied in July 2009. Mr. Scrogham immediately sought reconsideration of the denial of his application for benefits. He added chronic back and knee pain and obesity to his list of medical conditions. In September 2009, the Administration again denied Mr. Scrogham's request for benefits.

Mr. Scrogham then requested a hearing before an ALJ.[33] The hearing was held by videoconference on May 24, 2011.[34] The ALJ questioned Mr. Scrogham about the nature of his education and past work. Regarding his most recent job, at a pizza shop, Mr. Scrogham testified that he made pizza, did a little bit of scheduling and was responsible for counting money and making deposits. He testified that he had left the job because he could not stand or lift as much as he was required

---

[33] The hearing request stated:

> I request a hearing before an administrative law judge. I disagree with the determination made on my claim for disability-worker or child benefits because I am disabled and cannot work due to chronic back pain with radiculopathy affecting both legs and left arm, severe sleep apnea, HPB, arthritis in both knees, and severe obesity.

*Id.* at 109.

[34] The ALJ and a vocational expert were in Cincinnati, Ohio. Mr. Scrogham, his wife and his attorney were in Madison, Indiana.

to do: "I couldn't perform my job is what it basically boiled down to."[35]

The ALJ also asked Mr. Scrogham about his physical condition and his daily activities. Mr. Scrogham testified that since the alleged onset of his disability, November 2007, his wife usually drove him places, but he had driven to the doctor (a distance of fourteen miles) a couple of times. Mr. Scrogham testified that he started his day by taking pain medication and that he sat inside for most of the day because he could not do anything else given his leg and back pain. Mr. Scrogham testified that he had lost one hundred pounds at the advice of his doctors. At the time of the hearing, he recently had undergone back surgery, but he testified that it had not fixed all of his problems. Although at one point while he was recovering from surgery, Mr. Scrogham would walk over a mile twice per day, he testified that, because of his knee pain, he had reduced his walking in the three or four months prior to the hearing. He testified that, at the time of the hearing, he could stand and perform a task, such as washing dishes, for only about ten minutes before his legs and feet would go numb. He testified that he could not lift even relatively light items over an extended period of time or sit longer than twenty minutes at a time. He testified that he sometimes would mow the lawn, but it would take him all day to mow half an acre of grass because he could only use the lawnmower for about ten minutes at a time before he needed to rest. He considered himself to be mostly independent in terms of caring for himself (bathing, dressing, etc.). Mr. Scrogham testified that he attended church

---

[35] *Id.* at 50.

on Sundays from 10:15 a.m. to 11:00 a.m. Mr. Scrogham's wife also testified, primarily to explain that she did not believe that the examination by the state agency's physician, Dr. Gardner, yielded an adequate picture of Mr. Scrogham's health and abilities.

A vocational expert, Robert Breslin, also testified. He described Mr. Scrogham's prior jobs in terms of the level of physical exertion required to perform them[36] and in terms of the Department of Labor's Dictionary of Occupational Titles.[37] Breslin believed that if Mr. Scrogham had the abilities determined by Dr. Sands, he could probably perform some of his prior jobs that required "light work," such as working as a sales agent or a restaurant manager. He testified that if Mr. Scrogham were limited to sedentary work, he would not be able to perform his previous jobs, but his skills could transfer to positions such as telephone sales or customer service. Breslin further testified that if Mr. Scrogham could not sit for more than one hour out of an eight-hour work day, could not stand or walk and could not lift or carry anything, then he could not perform any of his prior jobs or the sedentary jobs discussed by Breslin. Finally, Breslin testified that if all of Mr. Scrogham's testimony before the ALJ were true, then Mr. Scrogham would not be able to work at all.

---

[36] *See* 20 C.F.R. § 404.1567 (defining categories of physical exertion from "sedentary work" through "very heavy work").

[37] *See* U.S. Dep't of Labor, Dictionary of Occupational Titles (4th ed. 1991), *available at* http://www.oalj.dol.gov/libdot.htm.

## C.

The ALJ denied Mr. Scrogham's request for benefits. The ALJ applied the five-step sequential evaluation process described in 20 C.F.R. § 404.1520(a)(4)(i)–(v). At step one, the ALJ held that Mr. Scrogham had not engaged in substantial gainful activity since the alleged onset of his disability. At step two, the ALJ held that Mr. Scrogham had a severe combination of impairments: (1) "spinal stenosis, status post back surgery on April 21, 2010;" (2) diabetes; and (3) obesity.[38] The ALJ also listed Mr. Scrogham's other physical conditions, which she determined were "not severe if considered singly or in combination."[39] She also found that his depression was not severe. At step three, the ALJ held that Mr. Scrogham's severe impairments did not meet or medically equal any of the qualifying impairments listed in the Code of Federal Regulations.

Before addressing step four, the ALJ determined that Mr. Scrogham had the residual functional capacity to perform "light work," which consists of "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds" and "a good deal of walking or standing," or "sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b). In reaching this decision, the ALJ found that Mr. Scrogham's testimony at the hearing was not credible. In making that finding, the ALJ noted that Mr. Scrogham's testimony about his capabilities conflicted with medical reports in the record

---

[38] A.R. at 14.

[39] *Id.* at 15.

and with other statements that Mr. Scrogham had made about his daily activities. The ALJ also decided not to give Dr. Alcorn's opinion as much weight as it typically would receive because it was inconsistent with other medical evidence and with testimony presented at the hearing.

At step four, the ALJ held that because of his residual functional capacity, Mr. Scrogham was capable of performing past relevant work as a sales manager, a restaurant manager and an auto sales manager and, therefore, that he was not disabled. At step five, the ALJ found that given Mr. Scrogham's age, education, work history and residual functional capacity, there were other jobs available to him in the national economy even if he were limited to sedentary work. The ALJ ultimately concluded, "The claimant has not been under a disability, as defined in the Social Security Act, from November 11, 2007, through the date of this decision (20 CFR 404.1520(f))."[40] The Administration's Appeals Council denied Mr. Scrogham's request for review.

### D.

Having exhausted his administrative remedies, Mr. Scrogham filed a complaint in August 2011 in the United States District Court for the Southern District of Indiana, seeking judicial review of the ALJ's decision. He alleged that the ALJ had erred by not giving controlling weight to the opinion of his treating physician, Dr. Alcorn; that the ALJ's credibility determination was erroneous; and that, for various reasons, the

---

[40] *Id.* at 22.

ALJ's determination that he was not disabled was not supported by substantial evidence.

The district court affirmed the Administration's denial of benefits. It held that the "ALJ's decision to discount Dr. Alcorn's findings and grant significant weight to non-treating sources was reasonable and well-supported."[41] The district court also held that the ALJ's credibility determination was supported by substantial evidence because, as the ALJ noted, Mr. Scrogham's credibility was undermined by conflicting medical findings, by evidence that Mr. Scrogham's condition was improving with treatment, by discrepancies between Mr. Scrogham's testimony and his professed activities and by the fact that Mr. Scrogham represented to a state unemployment agency that he was capable of and seeking full-time work. Finally, it held that the ALJ sufficiently considered Mr. Scrogham's obesity and, ultimately, that there was no error on which to reverse the ALJ.

## II

### DISCUSSION

Mr. Scrogham filed a timely notice of appeal and now submits that the ALJ erred in giving more weight to nontreating physicians' opinions than to treating physicians' opinions, that the ALJ's adverse credibility determination was not supported by substantial evidence, that the ALJ failed to consider the combined effects of all of Mr. Scrogham's impair-

---

[41] R.23 at 7.

ments and that the ALJ ignored the dearth of evidence from September 2009 through May 2011 supporting her conclusions. We have jurisdiction under 28 U.S.C. § 1291, and we now reverse.[42]

Because the Administration's Appeals Council declined to review the ALJ's decision, we review the ALJ's decision as the final decision of the Administration. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007). We review the ALJ's legal conclusions de novo and her factual determinations with deference. *Id.* If the ALJ's decision is supported by substantial evidence, we will affirm. *Id.* We "conduct a critical review of the evidence, considering both the evidence that supports, as well as the evidence that detracts from, the Commissioner's decision, and the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005) (internal quotation marks omitted). "In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Id.*

## A.

Mr. Scrogham submits that the ALJ ignored the fact that his back problems were caused by a progressive disease, the severity of which increased with time. Our review of the record indicates that the ALJ failed to consider at least two periods of

---

[42] The district court had jurisdiction under 42 U.S.C. § 405(g).

time when Mr. Scrogham's condition was possibly more disabling than she believed it to be: prior to his back surgery, in early 2010,[43] and just before the hearing, in early 2011.[44] The ALJ, however, never acknowledged in her opinion the waxing and waning of Mr. Scrogham's symptoms with time. *See Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994) ("Our cases consistently recognize that meaningful appellate review requires the ALJ to articulate reasons for accepting or rejecting entire lines of evidence.").

The ALJ's error in ignoring evidence in the record about how Mr. Scrogham's condition changed over time is compounded because of its apparent effect on the ALJ's decision to discredit the opinions of Mr. Scrogham's treating physicians. Under 20 C.F.R. § 404.1527(c)(1), an ALJ should "give more weight to the opinion of a source who has examined [the claimant] than to the opinion of a source who has not examined [the claimant]." Further, the applicable regulations state:

> Generally, [the ALJ] give[s] more weight to opinions from [the claimant's] treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture

---

[43] For example, in January 2010, Dr. James wrote that Mr. Scrogham "still has the pain when he is up and his legs seem to want to give out. He cannot walk any distance. He cannot stand for any period of time." A.R. at 607.

[44] For example, in May 2011, Dr. James wrote that Mr. Scrogham had been having "more problems with back pain" in recent months, that he had been depressed due to the amount of pain he was in, that he was experiencing numbness in his feet and that he fell several times over the winter months. *Id.* at 714.

of [the claimant's] medical impairment(s) and may
bring a unique perspective to the medical evidence
that cannot be obtained from the objective medical
findings alone or from reports of individual exami-
nations, such as consultative examinations or brief
hospitalizations. If [the ALJ] find[s] that a treating
source's opinion on the issue(s) of the nature and
severity of [the claimant's] impairment(s) is well-
supported by medically acceptable clinical and
laboratory diagnostic techniques and is not inconsis-
tent with the other substantial evidence in [the
claimant's] case record, [the ALJ] will give it control-
ling weight.

*Id.* § 404.1527(c)(2).

Here, the ALJ decided not to give controlling weight to
Dr. Alcorn's August 2010 report because she believed that the
report was "inconsistent with the weight of the objective
medical evidence."[45] Specifically, she believed that it was
inconsistent with the examination conducted by Dr. Gardner
in 2009. Further, the ALJ thought that Dr. Alcorn's report was
inconsistent with Mr. Scrogham's activities, "including helping
to work on a roof and working on other outside projects or
walking one to one and one half miles two times a day."[46]

In our view, the ALJ used faulty logic when she interpreted
these pieces of record evidence as inconsistencies. First, she

---

[45] *Id.* at 20.

[46] *Id.*

failed to consider that, because of the progressive nature of Mr. Scrogham's disease, there might have been a legitimate difference between his physical abilities in June 2009 and his abilities in August 2010. Relatedly, the ALJ did not explain why she believed that events that did not occur contemporaneously with Dr. Alcorn's report conflict with that report. For example, Mr. Scrogham apparently was working on a roof in July 2008. The "other outside projects" occurred in October 2009. The failure to acknowledge the difference in the timing between these events and Dr. Alcorn's report makes us skeptical of the ALJ's analysis.[47]

Additionally, the ALJ only provided reasons to discredit one report by Dr. Alcorn. The ALJ neither considered nor explained her decision not to consider the rest of Dr. Alcorn's copious records, which, upon closer review, might indicate that Mr. Scrogham was substantially more limited in his physical abilities than the ALJ initially concluded. The ALJ also appears to have ignored the treatment records of several other physicians who saw Mr. Scrogham on a regular basis: Dr. James, Dr. Vitto, Dr. Adams and Dr. Totten. Because the ALJ did not articulate her reasons for not considering the opinions of these treating physicians, we cannot engage in meaningful review of her decision.

Even when an ALJ decides not to give controlling weight to a treating physician's opinion, the ALJ is not permitted simply to discard it. Rather, the ALJ is required by regulation to

---

[47] The walking did occur at the same time as Dr. Alcorn's report, but for the reasons stated *infra* Part II.C, it does not necessarily contradict his report.

consider certain factors in order to decide how much weight to give the opinion: (1) the "[l]ength of the treatment relationship and the frequency of examination," because the longer a treating physician has seen a claimant, and particularly if the treating physician has seen the claimant "long enough to have obtained a longitudinal picture" of the impairment, the more weight his opinion deserves; (2) the "[n]ature and extent of the treatment relationship"; (3) "[s]upportability," i.e., whether a physician's opinion is supported by relevant evidence, such as "medical signs and laboratory findings"; (4) consistency "with the record as a whole"; and (5) whether the treating physician was a specialist in the relevant area. 20 C.F.R. § 404.1527(c)(2)–(5).

In this case, the record contained evidence about the length of Mr. Scrogham's relationship with his longstanding physicians, the nature of the treatment for his progressive disease, the consistency of the doctors' reports about Mr. Scrogham's back and knee pain and Dr. James's specialty as a surgeon. The ALJ, however, did not discuss any of these factors in her opinion, so we cannot assess whether she appropriately chose not to give much weight to the treating physicians' opinions.[48]

---

[48] We cannot say that the failure to consider these factors is harmless; we have acknowledged their significance in many of our prior cases. *See, e.g., Amax Coal Co. v. Franklin*, 957 F.2d 355, 359 (7th Cir. 1992) (observing that the opinion of a physician who has treated an individual with a progressive disease "over a period of many years might on that ground deserve some weight in comparison with" the opinion of someone who had seen the individual only once); *Allen v. Weinberger*, 552 F.2d 781, 785 (7th Cir. 1977) (holding that treating physician's opinion was entitled to weight where "he

(continued...)

The ALJ here should have addressed these factors in her opinion to enable us to review whether she engaged in the correct methodology. *See Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008) (explaining that when an ALJ denies a treating physician's opinion controlling weight, she determines how much weight to afford the opinion based on the factors now codified at section 1527(c)); *Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006) (noting that the factors now codified at section 1527(c) are "designed to help the administrative law judge decide how much weight to give the treating physician's evidence").

We will, therefore, remand Mr. Scrogham's case because the ALJ should have taken into account evidence regarding the progressive nature of Mr. Scrogham's ailments and the views of Mr. Scrogham's treating physicians.

---

[48] (...continued)

performed surgery that permitted him to examine directly the extent of plaintiff's spinal disorder," and where "he examined plaintiff on several occasions after surgery to observe his recovery"); *cf. Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 244 (6th Cir. 2007) (faulting the ALJ for not considering "factors tend[ing] to support affording the opinions of [the claimant's] treating physicians[] significant weight," such as the physicians' combined twenty years of treating the claimant, more than five hundred pages of evidence reflecting continuous and frequent treatment by the physicians; consistent reports of the same symptoms, which were increasing in severity; and similar diagnoses, prescriptions and assessments of the claimant's activities).

**B.**

Even reviewing the ALJ's opinion on its own terms—looking at the evidence on which she chose to base her opinion—it appears to us that the ALJ was inappropriately selective in choosing the evidence on which she based her opinion. Specifically, the ALJ identified pieces of evidence in the record that supported her conclusion that Mr. Scrogham was not disabled, but she ignored related evidence that undermined her conclusion. This "sound-bite" approach to record evaluation is an impermissible methodology for evaluating the evidence. *See Whitney v. Schweiker*, 695 F.2d 784, 788 (7th Cir. 1982) ("But it is equally clear that an ALJ must weigh all the evidence and may not ignore evidence that suggests an opposite conclusion."). As a result of the ALJ's failure to follow the proper methodology, we have reason to doubt the accuracy of her credibility determination and of her residual functional capacity assessments.

For example, the ALJ discredited Dr. Alcorn's residual functional capacity report in part because it conflicted with Dr. Gardner's report finding that Mr. Scrogham had a "full range of motion of the cervical spine, [and] nearly full range of motion of the lumbar spine."[49] The ALJ based this decision on notes that Dr. Gardner prepared following his examination of Mr. Scrogham. However, the ALJ ignored contradictory evidence in the same report. The report listed the normal ranges of motion for forward flexion, extension and lateral flexion of the lumbar spine as 90, 25 and 25, respectively. It

---

[49] *See* A.R. at 20 (referencing *id.* at 517).

then noted that Mr. Scrogham's ranges of motion for those tests were 40, 10 and 10, respectively. The ALJ did not address the apparent discrepancy between the two parts of the report; rather, she erred by taking the part of the report that favored her opinion and ignoring the part that did not. *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009) ("It is not enough for the ALJ to address mere portions of a doctor's report."). Additionally, the ALJ appears to have based her entire residual functional capacity assessment on the report prepared by Dr. Sands. However, she ignored the part of Dr. Sands's report that opined that Mr. Scrogham's statements about the extent of his symptoms were likely credible due to his obesity.

Similarly, our review of the record indicates that the ALJ considered evidence about Mr. Scrogham's activities selectively, ignoring evidence that contradicted her findings. For example, throughout her opinion, the ALJ cited Mr. Scrogham's operation of a riding lawnmower as proof that he was not as disabled as he claimed or that he overstated the extent of his symptoms. However, the testimony that Mr. Scrogham gave was that he could use a riding lawnmower for approximately ten minutes at a time, after which he would be incapacitated for a couple of hours.

The ALJ also wrote that Mr. Scrogham had been "exercising on a bicycle."[50] The original report, by Dr. Totten, actually stated that "[Mr. Scrogham] has been trying to work on a

---

[50] *Id.* at 19.

bicycle that seems to be tolerated by his joints and back."[51] The ALJ observed that Mr. Scrogham "had been helping work on his sister's roof."[52] However, the original source qualifies that statement: "He has been helping work on his sister[']s roof recently although normally he isn't quite that active."[53] The ALJ frequently used Mr. Scrogham's walking about a mile twice per day as evidence that he was not disabled. Physicians' notes indicate that Mr. Scrogham's ability to walk was hampered by back and knee pain and that it took up to twenty-eight minutes to walk that far. The ALJ relied on a physician's note that Mr. Scrogham was "let go for performance," from his job at the pizzeria, without acknowledging that Mr. Scrogham's wife, about whom the ALJ made no adverse credibility finding, testified that Mr. Scrogham quit that job because it put "[t]oo much pain and strain on his back, yes. He was just physically not able to be on his feet and doing the things that he was doing there."[54] We do not state that the ALJ's view of the facts is ultimately wrong, we simply hold that her apparent selection of only facts from the record that supported her conclusion, while disregarding facts that undermined it, is an error in analysis that requires reversal.

We also note that the ALJ discounted Mr. Scrogham's credibility because he had applied for, and received, unem-

---

[51]  *Id.* at 325.

[52]  *Id.* at 19.

[53]  *Id.* at 325.

[54]  *Id.* at 68.

ployment compensation during a portion of the period for which he now claims disability payments. The case law of this circuit clearly permits the ALJ to give some consideration to such activity on the part of the applicant when assessing his credibility. *Schmidt v. Barnhart*, 395 F. 3d 737, 746 (7th Cir. 2005). But attributing a lack of credibility to such action is a step that must be taken with significant care and circumspection. All of the surrounding facts must be carefully considered. In the case of a progressive disease, it is especially possible that an applicant might, at the early stages of the disease's manifestation, be unsure of the limits of his physical capabilities and only later determine that his inability to find work was due to the fact that the physical toll taken by the disease was greater than he had thought. The decision of the ALJ in this case does not contain any discussion of these considerations. On remand, this issue ought to be revisited and the reasons for Mr. Scrogham's action explored in more depth. We express no view on the outcome of such an analysis; that determination is for the ALJ.

Finally, we also note that the record reflects that Mr. Scrogham lost, at the direction of his physicians, a great deal of weight during the time at issue. To the degree that the surrounding facts and circumstances might suggest that this high degree of cooperation with his physicians is an indication that Mr. Scrogham also might not be inclined to overemphasize his pain or other physical limitations, the ALJ should take such cooperation into consideration in assessing his credibility. This determination is, of course, one for the ALJ.

## C.

Even if we were confident that the ALJ had selected evidence representative of the record as a whole on which to base her opinion, to the extent that the ALJ relied on evidence of Mr. Scrogham's daily activities to determine that he was capable of returning to work, those activities do not appear to us to constitute "substantial evidence that [he] does not suffer disabling pain," and they "do not establish that [he] is capable of engaging in substantial physical activity." *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000). In *Clifford*, the claimant testified

> that her typical household chores took her only about two hours to complete. Clifford indicated that she had to rest while doing household chores. She stated that she cooks, but only simple meals. She also indicated that she could vacuum, but it hurts her back. She stated that she goes grocery shopping about three times a month and "sometimes" carries groceries from the car to the apartment. She further stated that she could lift a twenty pound sack of potatoes, but she "wouldn't carry it long." Clifford testified that her husband helps her with the household chores whenever possible. While she babysits her grandchildren, she indicated that her depression is aggravated while watching them. In regard to walking, Clifford stated that she walked to get exercise at her doctor's suggestion. However, she stated that she must rest after walking anywhere between three and five blocks. Clifford further

indicated that she plays cards (two rounds) about
twice a month.

*Id.* We held in *Clifford* that the claimant's "testimony on her
daily activities d[id] not undermine or contradict her claim of
disabling pain." *Id.*

Mr. Scrogham's activities were significantly more limited
than the claimant's in *Clifford*. Where she could regularly
perform household tasks, go shopping and lift up to twenty
pounds, Mr. Scrogham testified that he could do none of those
things. Apart from his walking, the activities cited by the ALJ,
such as driving, mowing the lawn or working in the yard,
appear to have occurred only rarely. And the "sporadic
performance [of household tasks or work] does not establish
that a person is capable of engaging in substantial gainful
activity." *Thompson v. Sullivan*, 987 F.2d 1482, 1490 (10th Cir.
1993) (alteration in original) (internal quotation marks omit-
ted). Further, at least one of the activities was a precipitating
event that led to one of Mr. Scrogham's doctor's visits.[55]
Surely, this type of ill-advised activity cannot support a
conclusion that Mr. Scrogham was capable of performing full-
time work. *Cf. Matchen v. Apfel*, No. 99-3746, 2000 WL 562196,
at *4 (7th Cir. May 5, 2000) (faulting the ALJ for considering the
claimant's driving as evidence of his abilities where the

---

[55] *Id.* at 578 (stating that Mr. Scrogham went in for a consultation because
of right foot pain that he noticed while he "ha[d] been doing a project in his
back yard and he ha[d] been on his feet," and the pain "gradually got to the
point where it became difficult for him to walk"); *see also id.* at 304 (noting
that Mr. Scrogham went to the chiropractor to seek relief for pain that
started when he bent down to pick up a towel).

claimant had gotten into several car accidents because his conditions prevented him from driving well).

Reports of Mr. Scrogham's walking simply are too thin a reed on which to rest a determination that there is substantial evidence supporting the ALJ's conclusion that he could return to full-time work. In *Carradine v. Barnhart*, 360 F.3d 751 (7th Cir. 2004), we held that the claimant's daily activities, which included walking two miles, could not support the ALJ's conclusion that she could work. *Id.* at 756 ("The weight the administrative law judge gave to Carradine's ability to walk two miles was perverse: not only is it a form of therapy, but it is not a form of therapy available at work."). We also cited with approval a decision of our colleagues in the Ninth Circuit, which determined that rehabilitative efforts such as walking for an hour and swimming were "not necessarily transferable to the work setting with regard to the impact of pain." *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001). The Ninth Circuit observed that "[a] patient may do these activities *despite* pain for therapeutic reasons, but that does not mean she could concentrate on work despite the pain or could engage in similar activity for a longer period given the pain involved." *Id.*

Finally, the ALJ's finding that Mr. Scrogham's surgery and medications indicated that his symptoms were not as severe as he claimed them to be seems to us to be misguided. We previously have acknowledged that a claimant's election to undergo serious treatment, such as having surgery and taking "heavy doses of strong drugs," indicates that the claimant's complaints of pain are likely credible. *Carradine*, 360 F.3d at 755. Further, the fact that physicians willingly prescribed drugs

and offered other invasive treatment indicated that they believed the claimant's symptoms were real. *Id.* Instead of showing that Mr. Scrogham's limitations were not as severe as he alleged, evidence that he was willing to undergo risky surgery and take powerful pain medication—and that physicians were wiling to prescribe this course of treatment—reflects that Mr. Scrogham's symptoms caused him real problems.

We think that these three logical errors—overstating the significance of Mr. Scrogham's daily activities, overrelying on his rehabilitative efforts as proof of his fitness for full-time work and misinterpreting the significance of Mr. Scrogham's extensive treatment—had a material effect on the ALJ's credibility and residual functional capacity assessments. We emphasize, however, that we do not decide here that Mr. Scrogham is entitled to benefits. *See id.* at 756. It may be that he has exaggerated his symptoms or that more in-depth study of his condition would show that he could perform some work. *Id.* These issues are for the ALJ to decide, using the agency's expertise. *Id.* We reverse today only because "an administrative agency's decision cannot be upheld when the reasoning process employed by the decision maker exhibits deep logical flaws, even if those flaws might be dissipated by a fuller and more exact engagement with the facts." *Id.* (citations omitted).

## Conclusion

For the foregoing reasons, we reverse the judgment of the district court and remand the case for further proceedings consistent with this opinion.

REVERSED and REMANDED