NONPRECEDENTIAL DISPOSITION

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued November 15, 2016
Decided December 14, 2016

**Before**

DIANE P. WOOD, *Chief Judge*

WILLIAM J. BAUER, *Circuit Judge*

DIANE S. SYKES, *Circuit Judge*

No. 16-1968

| | |
|---|---|
| JOSEPH G. HUGHES, III,<br>    *Plaintiff-Appellant*, | Appeal from the United States District<br>Court for the Eastern District of Wisconsin. |
| *v.* | No. 2:14-cv-01525-NJ |
| CAROLYN W. COLVIN,<br>Acting Commissioner of Social Security,<br>    *Defendant-Appellee*. | Nancy Joseph,<br>*Magistrate Judge*. |

**O R D E R**

Joseph Hughes, a 41-year-old who suffers from inflammation and stiffness primarily in his neck and back, appeals the district court's judgment upholding the denial of his application for disability insurance benefits. An administrative law judge found that, despite his impairments, Hughes retained the residual functional capacity to perform his past relevant work as a retail-store manager and furniture salesman. Hughes challenges the adequacy of this RFC finding. Because substantial evidence supports the ALJ's decision, we affirm the judgment.

In 2011 Hughes applied for disability insurance benefits based on his ankylosing spondylitis, an inflammatory disease in his back and neck that, he said, rendered him unable to work. Hughes submitted a disability report to the Social Security Administration that detailed his past employment. Hughes, a high school graduate, previously worked as a furniture salesman, a mechanic, a car salesman, an automotive-service advisor, and most recently a manager at a flower shop that closed in 2009.

Hughes's recorded medical history dates back to 2006, when x-rays showed bone fusion in his lower cervical and lumbar spines, the complete fusion of joints in his pelvis, and the narrowing of the joint areas in his hips. In 2010 Hughes's rheumatologist, Dr. Miriam Cohen, noted that an x-ray showed "no significant change" in his condition, though she documented his poor spine flexibility. This latter finding was corroborated by Hughes's treating physician, Dr. Bruce Camilleri, who determined that Hughes's neck was "almost frozen." Dr. Cohen also reported that Hughes said his fatigue was "usual and not bad" and that Hughes had some pain for which he took ibuprofen after previously taking Enbrel, an anti-inflammatory prescription drug.

At Hughes's medical appointments in 2011, doctors noted a decline in Hughes's posture. At his first appointment, Dr. Cohen concluded that Hughes's "hangdog" stance—his neck and core stooped forward—had become more severe but that he was "otherwise stable considering his fused spine." Hughes complained of fatigue and stiffness, so Dr. Cohen recommended that he again take Enbrel and start physical therapy. Later in 2011 Hughes had a consultative examination with Dr. Abdul Hafeez, who reported that Hughes had "no limitation in [his] upper extremity" but "walk[ed] like an old person bent over slightly." Dr. Hafeez further noted that Hughes could move his neck 10 degrees to the left and 20 degrees to the right and that he had to push his eyes upward to look ahead. At Hughes's third appointment in 2011, Dr. George Walcott, a state-agency physician, concluded that Hughes retained sufficient physical capabilities to perform light work. Dr. Walcott determined that Hughes was capable of occasionally lifting 20 pounds, frequently lifting 10 pounds, and "stand[ing] [sitting,] or walk[ing] with normal breaks for a total of about 6 hours in an 8-hour workday."

Another state-agency physician, Dr. Pat Chan, evaluated Hughes in 2012 and downgraded Hughes's functional capacities because of his fatigue and pain. Dr. Chan determined that Hughes could occasionally lift 10 pounds and frequently lift less than 10 pounds. Dr. Chan also concluded that Hughes could stand or work for at least two hours and could sit for about six hours in an eight-hour workday. And Dr. Chan

determined that Hughes should never perform work that involved ladders, ropes, or scaffolds, or exposed him to hazardous machinery.

Dr. Cohen did not find significant change in Hughes's condition in 2012. At his first appointment, Dr. Cohen documented that Hughes's pain had lessened and his ankylosing spondylitis was "mildly active." Dr. Cohen also discussed Hughes's fatigue with him and suggested that it could be caused by arthritis or by neck pain disrupting his sleep. At Hughes's next appointment, Dr. Cohen determined that Hughes had experienced "little change of his severe and chronic axial disease except for some decrease in spine measurements." She remarked that his "severe limitation in axial mobility is not likely to reverse or significantly improve" and suggested that he consider receiving Remicade infusions, which reduce swelling and inflammation.

Dr. Cohen sent the Social Security Administration a letter in support of Hughes's disability claim in February 2012. She said that Hughes's ankylosing spondylitis "significantly affected his entire spine" by giving him "minimal mobility at his neck, thoracic, and lumbar spines." Dr. Cohen also wrote that Hughes had limited peripheral vision because of his restricted neck movement and asked that his "severe and longstanding spine deformities" be deemed "disabling."

At Hughes's request, Dr. Julian Freeman, specializing in internal medicine, confirmed Hughes's ankylosing spondylitis diagnosis "without complete fusion of the spine at positions of highly unfavorable angulation." Because of Hughes's inflammation, Dr. Freeman opined that Hughes should be limited to two hours of standing or walking per day in five-minute intervals, six hours of sitting, and "extremely rare . . . bending, crouching, stooping, . . . [and] climbing." Dr. Freeman also found that Hughes could move his limbs only very slowly and that his neck had a range of motion that was one-fifth that of most persons. But Dr. Freeman said that it was "unclear" whether Hughes's ailments met the Commissioner's criteria for inflammatory-arthritis disability.

At Hughes's appointment with Dr. Cohen in 2013, she concluded that his ankylosing spondylitis was "nearly end-stage . . . with persistent, moderately severe disease activity—increased, severe loss of mobility at [the cervical] spine and some peripheral arthritis." Hughes reported that he felt greater pain in his neck and back. Dr. Cohen again noted that he had a hangdog bend in his neck and recommended that Hughes receive Remicade infusions and perform physical therapy.

At his hearing before an administrative law judge in 2013, Hughes commented on his physical capabilities and job search after the flower shop closed in 2009. He said that he received unemployment compensation for the year following the shop's closing. He explained the timing of his application in 2011 for disability insurance benefits by remarking that he concluded then that employers would not hire him because he "would walk in and . . . was hunched over [and] they were, like this [is] not really someone we want to work with." While at home Hughes said that he could complete "light-duty" chores and could lift 50 pounds but would need to take breaks of ten to fifteen minutes. He also said that he could walk or stand for about two hours before becoming stiff and that he could sit, walk, or stand for about four to six hours per day. If he sat for two hours, Hughes said that he needed to walk for roughly 15 minutes before sitting down again. He also said that he must take at least one 15-minute nap each day. As a final matter, Hughes said that he did not have enough money to pay the co-pays for Enbrel or physical therapy recommended by Dr. Cohen.

The ALJ asked the vocational expert to consider the possible employment opportunities for a person of Hughes's age, education, and work experience who could not climb ladders, ropes, or scaffolds, and must avoid heights and the use of moving machinery. The ALJ added that this person could only occasionally crouch, use peripheral vision and climb stairs, could not experience extreme cold, wetness, or humidity, and could use frequently his right upper extremity. The vocational expert said that this person could work as a furniture salesman, a retail manager, or as an office, shipping, stock, or information clerk. The ALJ then questioned what jobs would be available for a person with these restrictions who also "needs to be able to sit alternatively at will provided that they're not off task more than 10 percent of the work period." The vocational expert said that this person could perform Hughes's prior work selling furniture and managing retail.

The ALJ applied the five-step analysis in 20 C.F.R. § 404.1520(a)(4), and found Hughes not disabled. The ALJ determined that he had not engaged in substantial gainful activity since the alleged onset date of May 23, 2011 (step one); that his ankylosing spondylitis was a severe impairment (step two); that this impairment did not equal a listed impairment (step three); that he had the residual functional capacity to perform light work, with the limitations of standing or sitting at his discretion as long as he was working 90% of the time, only occasionally reaching overhead, using his peripheral vision, crouching, and climbing stairs, and never climbing ladders, ropes, or scaffolds or being exposed to extreme cold or humidity; and that he could perform both

of his past jobs as a retail manager and furniture salesman as well as other unspecified jobs (step four).

In determining Hughes's RFC, the ALJ found his testimony about the severity of his impairments "not entirely credible." The ALJ noted that Hughes used only non-prescription drugs to control his pain, had "good retained function," and engaged in "a good range of activities of daily living, suggesting his condition is not as disabling as alleged." Moreover, the ALJ explained that Hughes's employment and "work-related activities" show that he has the ability to work.

The Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. *See Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015).

A magistrate judge, presiding by consent, *see* 28 U.S.C. § 636(c)(1), affirmed the ALJ's decision. In the magistrate judge's view, the ALJ reasonably rejected Dr. Chan's suggestion that Hughes's fatigue limited him to sedentary work because he was able to perform a moderate amount of daily activity and the record does not contain evidence that Hughes's fatigue increased after he worked at the flower shop. The magistrate judge also concluded that the step-four limitations specified by the ALJ sufficiently accounted for Hughes's physical limitations and need for rest. The magistrate judge finally upheld the ALJ's finding that Hughes had "good retained function" because his motor skills were not impaired and his condition did not significantly change since he stopped working.

Hughes contends that the ALJ erred by not evaluating objective medical evidence of his symptoms before considering the credibility of his allegations regarding his symptoms. Federal regulations define objective medical evidence to mean "medical signs and laboratory findings," 20 C.F.R. § 404.1512(b)(1)(i), and "evidence from the application of medically acceptable clinical and laboratory diagnostic techniques." *Id.* § 404.1529(c)(2). According to Hughes, the ALJ disregarded objective medical evidence of his condition and focused instead on his "medical history, opinions, and statements about treatment." He asserts that even if the ALJ concluded that the objective medical evidence did not support Hughes's allegations, the ALJ did not justify his conclusion.

But Hughes is mistaken in contending that the ALJ did not consider the relevant medical evidence of Hughes's condition. The ALJ scrutinized the evidence documenting the progression of his ankylosing spondylitis, including a series of measurements showing deterioration in his posture. In discussing the progression of

Hughes's condition, the ALJ explicitly referred to multiple x-rays of his lower back, neck, and hips. As a final matter, the ALJ addressed Hughes's relative mobility by citing medical examination results and concluding that he had a "good range of motion in his knees."

Hughes also contends that for three separate reasons, substantial evidence does not support the ALJ's adverse credibility finding regarding the "intensity, persistence and limiting effects of [Hughes's] symptoms." *See Curvin v. Colvin*, 778 F.3d 645, 648 (7th Cir. 2015). Hughes first argues that the ALJ improperly inferred that his active job search between 2009 and 2011, his receipt of unemployment benefits, and his past work while having ankylosing spondylitis suggest that he could work and that he believed he could work. Since working at the flower shop, he says, his ankylosing spondylitis has worsened. He contends that this deterioration explains his inability to work now despite working between 2001 and 2009 with this condition. He maintains that his job search between 2009 and 2011 was a "testament to his character" and showed only that he wanted to work, not that he could work, as did his receipt of unemployment benefits.

But the ALJ did not improperly interpret these facts in discrediting Hughes's claims of his symptoms' severity. In applying for unemployment benefits in 2009, Hughes represented to Wisconsin authorities that he was "ready, willing, and able to work." *See Schmidt v. Barnhart*, 395 F.3d 737, 746 (7th Cir. 2005) ("[W]e are not convinced that a Social Security claimant's decision to . . . represent to state authorities . . . that he is able and willing to work should play absolutely *no* role in assessing his subjective complaints of disability.") *See also Scrogham v. Colvin*, 765 F.3d 685, 699 (7th Cir. 2014). In addition, Hughes's explanation for the timing of his disability application—that he concluded in 2011 that employers would not want to hire him because of his hunched-over appearance—suggests that he could not *find* work, not that he could not *perform* work. *See Schmidt*, 395 F.3d at 745 (finding it reasonable that an ALJ interpreted a disability applicant leaving the workforce because he was laid off, not "an inability to perform," as supporting the conclusion that he did not have a disability).

Further, we defer to the ALJ's conclusion that Hughes's work-related activities after his last job suggest that he can work because reasonable persons could disagree about the severity of his condition since 2009. *See Schmidt*, 395 F.3d at 745. Dr. Camilleri determined in 2010 that Hughes's posture had worsened since 2007. Dr. Cohen confirmed this finding in Hughes's 2011 evaluation and noted that Hughes's hand stiffness and foot pain from walking had increased since his 2010 appointment.

Dr. Cohen further documented in 2013 that Hughes's back and neck pain had intensified and that he had lost mobility in his neck. But Dr. Cohen also concluded based on a 2010 x-ray that Hughes experienced no "significant change" in his medical condition from 2006 and that he had "minimal disease activity" as of 2011 and "little change of his severe and chronic axial disease" as of 2012.

Hughes's second challenge to the ALJ's credibility determination is that the ALJ wrongly inferred from his testimony of his daily activities that he could work 40 hours per week. Although we have "urged caution in equating [daily] activities with the challenges of daily employment in a competitive environment," *Beardsley v. Colvin*, 758 F.3d 834, 838 (7th Cir. 2014), the ALJ's RFC assessment accounted for Hughes's need for breaks and his physical limitations. The RFC assessment addressed Hughes's need to take a 15-minute nap by allowing him to be "off task" up to 10 percent of work time and to alternatively sit and stand as necessary to address his stiffness from staying in a particular position for a prolonged period.

Moreover, the ALJ did not improperly discount Hughes's fatigue because Hughes's own statements and those of his doctors undercut the credibility of his claim that he cannot work 40 hours per week. Hughes said in his disability application in 2011 that he did not take naps during the day and told Dr. Chan in 2012 that his fatigue was "mild." Hughes asserts, without citations to the record, that his fatigue increased between 2011 and 2013. The record shows that Hughes reported fatigue to Dr. Cohen in 2012, though she did not assess his fatigue as debilitating. We would expect that Hughes's doctors would document increases in Hughes's fatigue, but it went unmentioned in Dr. Freeman's report in 2012, Dr. Cohen's 2012 letter to the Social Security Administration, and Dr. Cohen's written evaluation in 2013.

Third, Hughes argues that the ALJ wrongly discredited his complaints of pain by not addressing his reasons for taking ibuprofen rather than prescription pain killers. Hughes explained at the hearing that he could not afford the co-pays for prescribed pain killers after losing his job and that he had trouble sleeping after taking them. But the ALJ's adverse credibility finding was not "patently wrong," *Elder v. Astrue*, 529 F.3d 408, 413–14 (7th Cir. 2008) (citation omitted), given the lack of evidence of a significant decline in Hughes's condition since he last worked and the fact that he applied for benefits only after concluding that he could not find work. The ALJ's error in disregarding Hughes's reasons for not taking prescription pain killers was harmless because the ALJ explained his credibility assessment with reasons supported by the record and remanding to correct the ALJ's error would not change this case's outcome.

*See Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013); *Roundy's Inc. v. N.L.R.B.*, 674 F.3d 638, 648–49 (7th Cir. 2012).

We AFFIRM the district court's judgment.